J-S14031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.J.T., III, FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 101 MDA 2024 |

Appeal from the Order Entered December 26, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000116-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: J.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.J.T. III, FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 102 MDA 2024 |

Appeal from the Order Entered December 26, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000117-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: Q.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.J.T. III, FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 103 MDA 2024 |

Appeal from the Order Entered December 26, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000251-2016

| | | |
|---|---|---|
| IN THE INT. OF: J.J.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |

:
APPEAL OF: J.J.T., III, FATHER
:
:
:
:
:
:
:
:                   No. 157 MDA 2024

Appeal from the Order Entered December 26, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0151

IN THE INTEREST OF: J.J.T., A            :    IN THE SUPERIOR COURT OF
MINOR                                    :           PENNSYLVANIA
:
:
:
APPEAL OF: J.J.T., III FATHER            :
:
:
:
:
:                   No. 158 MDA 2024

Appeal from the Order Entered December 26, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0152a

IN THE INTEREST OF: Q.N.T., A            :    IN THE SUPERIOR COURT OF
MINOR                                    :           PENNSYLVANIA
:
:
:
APPEAL OF: J.J.T., III, FATHER           :
:
:
:
:
:                   No. 159 MDA 2024

Appeal from the Decree Entered December 26, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0153

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                        **FILED: MAY 10, 2024**

J.J.T., III (Father), appeals from the decrees terminating his parental rights to his minor sons, Q.N.T. (born in June 2015), Jo.T. (born in September 2018), and Ja.T. (born in October 2019) (collectively, Children), and from the orders changing Children's permanency goals from reunification to adoption.[1] We affirm the decrees and orders.

The orphans' court explained the York County Office of Children, Youth, and Family's (CYF, or the Agency) first involvement with Father:

> Father's involvement with [CYF] reaches back to 2016 when Q.N.T. was placed in emergency temporary custody due to concerns with Father and Mother's illicit drug use, allegations of domestic abuse, and Mother's mental health [struggles]. *See* Application of Emergency Protective Custody, Aug. 26, 2016 (CP-67-DP-251-2016). Q.N.T. was adjudicated dependent[,] until the court terminated supervision in October[] 2017.

Orphans' Court Opinion, 2/20/24, at 2.

On March 15, 2021, CYF filed dependency petitions citing its extensive prior involvement with the family, Father's and Mother's substance abuse, domestic violence concerns, and lack of stable housing. CYF also filed applications for emergency protective custody, which the juvenile court granted. While Children were in emergency care, Father was granted twice weekly supervised visits.

The juvenile court adjudicated Children dependent on April 27, 2021. Children's permanency goals were reunification with parents, with concurrent

---

[1] The orphans' court also terminated the parental rights of Children's biological mother. Mother is not a party to the instant appeal.

goals of adoption. *See* Order of Adjudication, 4/27/21, at 3.[2] The court ordered Father to undergo a drug and alcohol assessment and parenting capacity assessment. *See id.*, Appendix. Further, the juvenile court directed Father to complete random drug and alcohol testing, individual mental health counseling, and to participate with an in-home team and the county's Mental Health – Intellectual & Development Disabilities (MHIDD) program. *See id.*

In its opinion, the orphans' court detailed Father's progress:

> By June 29, 2021, Father's progress was minimal, though he did have a parenting capacity assessment scheduled. By September 1, 2021, Father had completed his parenting capacity assessment and started working with Pressley Ridge[3] and MHIDD. Father's progress was still rated as minimal.
>
> By December 7, 2021, Father's progress was rated as moderate. The court found that Father's parenting capacity assessment recommended he participate in individual therapy, adhere to the protocols of having a medical marijuana license, and that he have supports for his brain injury. Father also had recently moved into a five-bedroom home. When Pressley Ridge sent a Therapeutic Support Unit to Father's new home, the unit left due to a strong odor of marijuana and Father appearing to be under the influence. Father was dismissive and blamed the situation on his brain injury. The court also found that Father took medication for his brain injury and attended physical therapy twice per week. Father's supervised visits were inconsistent, so the court altered his visitation schedule to once per week for three hours.
>
> … On February 15, 202[2], the court found Father's progress was still moderate. Father continued to work with Pressley Ridge's

---

[2] The juvenile court entered separate, but substantially identical, orders at each child's dependency docket.

[3] CYF referred Father to Pressley Ridge, an organization that provides various programming, including therapeutic supervised visitation. *See* N.T., 2/15/22, at 8.

therapeutic team[,] and [Pressley Ridge was] planning on closing successfully. Father also completed a second drug and alcohol evaluation that recommended outpatient counseling. Father continued to miss his visits with [C]hildren and Pressley Ridge … [terminated services due to Father's failure to comply]. Father's visits were then [s]upervised [by] Carla Arp. Father missed his first visit and cancelled the second.

By May 10, 2022, Father had participated in a drug and alcohol evaluation, and a psychological evaluation. Father's housing was deemed appropriate[,] though he required that paternal grandmother live with him to assist with his brain injury. Father's visits were now supervised by PA Child. He was to have two visits per week for two hours. Father was generally unable to control [C]hildren's behaviors and would usually end visits early. It was suggested that Father have extra help with handling the [C]hildren during visits, and CYF agreed the visits could occur within his home. The court also learned that Father was [submitting to] drug testing through his probation and continued [to] test positive for marijuana[,] despite not having a medical marijuana card.

By August 16, 2022, Father's progress had regressed to "minimal." Father failed to keep in contact with CYF and failed to provide the [A]gency with confirmation of his participation in therapy or anger management. Father had obtained a medical marijuana card and provided CYF with a copy. Father also failed to provide CYF with evidence that he purchased his marijuana legally. Though Father's home was deemed appropriate, Father never provided CYF with verification of his income and household bills.

By this point[,] Father was having two in-home visits each week that were supervised by PA Child. Father's visits were adequate, but PA Child had concerns with Father's involvement and memory. It was noted that paternal grandmother was heavily involved in interacting with and playing with [C]hildren.

Orphans' Court Opinion, 2/20/24, at 2-5 (footnote added; citations omitted).

On September 8, 2022, CYF filed petitions to terminate Father's rights to each of the Children. CYF also filed motions to change Children's

permanency goals to adoption. In addition to the above, the Agency explained that Father often ended visits early. Father also failed to provide documents to support his medical marijuana card. Motion for Change of Goal, 9/8/22, at 2.

The orphans' court conducted a hearing on the termination petitions on October 24, 2022. At that time, the orphans' court denied the Agency's petitions for involuntary termination, noting Father's progress toward his goals:

> I think he has made progress. I think when you go down the [] list of things that he's been told to do, he's been ticking off boxes. His progress has not been as fast perhaps as might be optimal…. I have a number of reasons to be optimistic about Father. He has appropriate housing right now. He's got support people in his life right now that are able to provide him with assistance and I'm very curious in finding out as, you know, whether or not he's going to be able to play a greater role in [Children's] lives going forward.

N.T., 10/24/22, at 175 (paragraph break omitted). The court cautioned, however, that Father needed to continue to make progress. *See id.* at 177-78.

The orphans' court detailed its subsequent findings:

> At a status review hearing on November 15, 2022, the court found that Father was still unemployed. Father continued to work with therapeutic services through PA Child and continued to have visits that reportedly went well. Father was more engaged with [C]hildren. Father also had made inappropriate comments regarding the supervised visits prior to one of the visits. The court found that Father was living with his ex-fiancé, who had an extensive criminal history. She was directed to leave the home during Father's visits. Father was cooperative with providing PA Child information about her. The court also found that Father previously tested positive for cocaine[,] and had done so as

- 6 -

recently as November 7, 2022. At the hearing[,] the court also denied Father's petition to transfer to partially unsupervised visits and directed they remain fully supervised.

By January 24, 2023, Father's progress was still rated as minimal. Though Father attended monthly parent support groups, he continued to struggle with parent education sessions. Father had completed another drug and alcohol evaluation[;] however, he was inconsistent with drug testing and had a 34 percent call-in compliance. With regards to his visits, PA Child noted that he spent most of his time with Q.N.T. and did not pay much attention to the other children.

At a status review hearing on April 24, 2023, the court found that Father was now self-employed and had a business providing legal services. Father was incapable of providing CYF with any evidence of legitimate income from the business. Father completed his parenting courses with PA Child but had not cooperated with the services. He had been referred for parenting coaching with Pressley Ridge. The court also found that Father was still inconsistent with his drug testing. Father had tested positive for alcohol three times, and two of those three tests were on days that Father had visits with [C]hildren. Father was subsequently referred for a threat of harm evaluation.

Father's visits also seemingly regressed. Between February 1, 2023[,] and April 24, 2023, Father had cancelled 31 percent of his visits. PA Child noted safety concerns with [C]hildren[,] and believed Father was overwhelmed by them. Father was also aggressive with PA Child's staff[,] which caused them to fear reporting on Father's visits in court. As such, PA Child recommended reducing Father's visits to once per week.

Orphans' Court Opinion, 2/20/24, at 6-8 (citations omitted).

Additionally, the orphans' court observed that during his childhood, Father had been removed from paternal grandmother's home and placed in foster care because of allegations of domestic abuse and paternal grandmother's substance abuse. *Id.* at 8. "This gave CYF concern with Father's reliance on paternal grandmother as a support." *Id.*

In July 2023, Father got married. Father now resides with his wife, who is not permitted to participate in Father's visits with Children, as she is involved in separate termination proceedings with the Agency. **See** N.T., 12/22/23, at 23-24, 75-76.

By the July 2023 permanency review,

Father's progress was still minimal. Father was criminally charged in April[,] which had caused his bail on prior charges to be revoked.[4] As a result, Father was briefly incarcerated …. Despite his incarceration, Father[ had more consistently submitted to his required drug testing]. Father's visits were still not going well. Out of the previous seven visits, Father missed two and was late to four. During visits[,] Father was not engaged with [C]hildren and had little interaction.

Alarming to the court was the discovery that, in flagrant violation of court order, [C]hildren's kinship guardian had been permitting Father to have unsupervised visits and overnight visits outside of the Commonwealth. As a result, [C]hildren were placed with a different kinship guardian. Clearly this also involved [F]ather's participation in disregarding safety protocols that the order intended to implement in requiring supervised visits only.

**Id.** at 8-9 (footnote added; citations omitted).

On September 15, 2023, CYF filed petitions for involuntary termination of Father's parental rights to Children, and motions to change Children's permanency goal to adoption. The orphans' court held a combined

_____

[4] During the July 2023 permanency review hearing, the juvenile court took judicial notice of Father's two pending criminal dockets. N.T., 7/7/23, at 7. Father testified at the termination hearing that he was incarcerated from June 8, 2023, until September 4, 2023, for a driving under the influence conviction. **See** N.T., 12/22/23, at 145. At the time of the termination hearing, Father was on house arrest. **Id.** at 146.

termination and goal-change hearing on December 22, 2023. Children were represented by Scott Beaverson, Esquire (appointed legal counsel), and Christopher Moore, Esquire (guardian *ad litem* (GAL)). Father participated in the hearing, and his interests were represented by appointed counsel. At the close of the hearing, the orphans' court granted the Agency's petitions and terminated Father's parental rights under Section 2511(a)(1), (2), (5), (8), and (b). The court also changed Children's permanency goals from reunification to adoption.

Father filed timely a notice of appeal at each juvenile court and orphans' court docket, along with Pa.R.A.P. 1925(a)(2)(i) concise statements of errors complained of on appeal. This Court consolidated the appeals *sua sponte*. The orphans' court has also complied with Rule 1925.

Father now raises the following issues:

1. Did the [orphans' c]ourt abuse its discretion and err as a matter of law in finding that the Agency met its burden to terminate Father's parental rights under 23 Pa.C.S.A. [§] 2511(a)(1), (2), (5), (8), and 2511(b)?

2. Did the [orphans' c]ourt abuse its discretion in changing the primary goal from reunification to adoption?

Father's Brief at 6 (numbering added).

In considering Father's claims, we recognize

appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence,

- 9 -

an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which provides for a bifurcated analysis. First, the juvenile court "must focus on the parent's conduct" relative to the enumerated ground for termination set forth in 23 Pa.C.S.A. § 2511(a)(1)-(11). *Id.* at 830. If the court finds grounds for termination under Section 2511(a), it must then assess the evidence relative to the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, the orphans' court terminated Father's parental rights to Children under Section 2511(a)(1), (2), (5), (8), and (b). We address Father's termination under subsection 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the condition and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. …

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy the requirements of Section 2511(a)(2), CYF must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination under this subsection "are not limited to affirmative misconduct,

- 11 -

but concern parental incapacity that cannot be remedied." ***Id.***; ***see also In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010) ("[S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." (citation omitted)). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." ***In re C.M.K.***, 203 A.3d 258, 262 (Pa. Super. 2019).

Father claims the Agency did not present clear and convincing evidence to support termination under Section 2511(a)(2). ***See*** Father's Brief at 25-28. Father asserts he is now able to provide essential care for Children. ***Id.*** at 26. Father argues "any concerns about drug usage have been addressed." ***Id.*** at 26-27. To the extent the orphans' court relied on the Agency's concerns about Father's traumatic brain injury, Father counters:

> It appears, unfortunately, that the Agency argued, and the [orphans' c]ourt accepted that since Father suffered a traumatic brain injury, that is an incapacity that cannot or will not be remedied. It should be noted that this "incapacity" existed at the time of the prior termination hearing[,] but the [c]ourt denied that [p]etition. There is no dispute that Father suffered an injury and he will have to deal with that the rest of his life. That does not mean, however, that he is unable to parent these [C]hildren. Father is not in a situation where he personally requires care to maintain himself. He does attend counseling to improve himself. This is not a situation where Father's injury makes him unable to parent. Quote honestly, there was no evidence presented that he cannot parent these [C]hildren. Perhaps the Agency feels it is not a positive, but Father also has [paternal grandmother,] who is willing to help him with [C]hildren.

- 12 -

*Id.* at 27-28.

In its opinion, the orphans' court reiterated Father's continued difficulty with supervised visits:[5]

> Father has consistently struggled with his supervised visits. Throughout the entirety of [C]hildren's dependency matter, Father's visits were widely inconsistent. What was consistent was his tardiness and cancellations. As recently as a hearing on July 7, 2023, the court heard credible testimony that Father had missed two of his previous seven visits. He arrived late to four of the other five visits. PA Child's final visitation report for April and May 2023 shows that Father missed approximately 31 percent of his visits during those two months. The report also notes numerous times that Father arrived late. Father's inconsistent attendance led to PA Child terminating services with Father on May 17, 2023, approximately four months before CYF filed its petition.
>
> When he did have visits, Father struggled with being attentive and interacting with [C]hildren. There were visits when he would only pay attention to one child and ignore the others. Father also had issues controlling [C]hildren. While supervised by PA Child[,] there was a long history of Father not stopping [C]hildren from damaging PA Child's property. There were even times when Father would terminate the visits early because he could not control [C]hildren. **In thirty-two months**[,] **Father never showed the visit supervisors that he could care for [C]hildren … outside of a supervised setting.**
>
> The court does not believe such actions surrounding visits are evidence of an affirmative, good faith interest in maintaining a parent-child relationship. Rather, it appears to this court that Father is only interested [in] undertaking parental duties when and if it interests him.

---

[5] While the orphans' court set forth this portion of its analysis in its discussion of subsection 2511(a)(1), it references this history in its discussion of subsection 2511(a)(2). *See* Orphans' Court Opinion, 2/20/24, at 22.

Orphans' Court Opinion, 2/20/24, at 20-22 (citations omitted; emphasis added).

The orphans' court also found:

Father clearly is incapable of providing [C]hildren with essential care or control in a supervised setting. He has been incapable of doing so for approximately thirty-two months. His longstanding incapacity shows the court that Father cannot or will not remedy the causal conditions. It is possible that some of the issues stem from Father's condition; however, the court is also sympathetic to the needs of [C]hildren. [C]hildren need a parent who can provide them with proper care, control, or subsistence necessary for their wellbeing. Father acknowledged that his brain injury is something that he must live with for the rest of his life. If his injury is the cause of his incapacity, then perhaps Father's incapacities cannot be remedied. What is clear to the court is that he retains[,] after thirty-two months, an incapacity that currently exists and is manifested in the failure to care adequately for [C]hildren when in his care.

**Regardless of the root cause of Father's incapacities, he has shown over the course of thirty-two months that he is either unwilling or incapable of remedying the conditions**. The court believes that Father's **continued inability to progress to a point where he could safely engage in partially unsupervised visits with** [**C**]**hildren** is clear and convincing evidence that termination pursuant to [Section] 2511(a)(2) is warranted.

*Id.* at 23 (emphasis added).

We discern no error or abuse of discretion, as the record supports termination under Section 2511(a)(2). This Court has recognized that a Child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of

progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

Because the evidence supports termination under Section 2511(a), we next examine Children's needs and welfare pursuant to Section 2511(b). ***See In re K.Z.S.***, 946 A.2d 753, 760 (Pa. Super. 2008). "The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the primary consideration must be the child's developmental, physical and emotional needs and welfare." ***In the Interest of K.T.***, 296 A.3d 1085, 1105 (Pa. 2023) (quotation marks omitted).

This Court has repeatedly stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." ***In re C.W.U., Jr.***, 33 A.3d 1, 6 (Pa. Super. 2011) (citation omitted). "[T]he court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." ***Interest of: J.R.R.***, 229 A.3d 8, 12-13 (Pa. Super. 2020) (citation and quotation marks omitted); ***see also In re T.S.M.***, 71 A.3d at 268 (stating, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition.").

Father baldly claims that the record does not support termination, as he is able to meet Children's developmental, physical, and emotional needs and

welfare. Father's Brief at 32.[6] According to Father, Children wish to remain in his care. *Id.*; *see also id.* (noting that Q.N.T. is not able to remain in his current foster home).

During the termination hearing, Children's legal counsel stated Children "are unanimously of the position that they would like to return to their [Father's] care." N.T. 12/22/23, at 190. In its opinion, the orphans' court similarly acknowledges that Father and Children share a strong bond. *See* Orphans' Court Opinion, 2/20/24, at 26; *see also id.* ("Termination is likely to be painful for [C]hildren….").

The orphans' court nevertheless concluded termination of Father's parental rights would serve Children's best interests and welfare:

> The court recognizes that these [C]hildren have emotional and developmental needs. … Q.N.T. has a history of sexualized and aggressive behaviors. He has physically assaulted his siblings and other children. [Q.N.T.'s] behaviors have influenced his siblings to do the same and have caused his foster parents to give notice for removal. Father was given thirty-two months to show he could provide for [C]hildren in a *supervised* setting. He failed to do so. After thirty-two months[,] Father is still incapable of basic duties such as interacting with and controlling [C]hildren. Yet [C]hildren have heightened emotional and developmental needs that require care above and beyond mere interaction and control. The minimal care Father struggles to provide is nowhere near the level of attention and care that [C]hildren need.
>
> [C]hildren also require permanency. By the time the court terminated parental rights, [**C]hildren had been in foster care**

_____

[6] Father's argument concerning Section 2511(b) includes only cursory citations. Because Father did not fully develop this claim, we could deem it waived. Nevertheless, we address Children's best interests under Section 2511(b).

**for approximately thirty-two months. Several different foster families have cared for [C]hildren while they waited for Father to cure his underlying incapacities.** Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide [Children] with [their] immediate physical and emotional needs.

[C]hildren have waited long enough. If Father's rights were not terminated, [C]hildren would continue to languish in foster care based on the false hope that someday they would be reunited with Father. After thirty-two months, Father is still incapable of properly caring for [C]hildren in a supervised setting. How much longer will [C]hildren have to wait for Father to progress to partially unsupervised visits? Fully unsupervised visits? **The court cannot subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.**

[C]hildren are almost certainly to be upset by the termination. It will undoubtedly be difficult for [C]hildren, and the court is sympathetic to their feelings. The court has considered their emotions. The court also has considered other factors[,] including [C]hildren's heightened needs and Father's failure to provide for [C]hildren's basic needs in a supervised setting. Of special importance is the court's consideration of [C]hildren's need for permanency. The court believes these other factors outweigh [C]hildren's bond with Father. **Based on the totality of the circumstances, the court believes that clear and convincing evidence exists to show that [C]hildren's emotional, developmental, and physical wellbeing are best served by terminating Father's parental rights.**

*Id.* at 27-29 (italics in original; emphasis added; citations omitted).

Further, CYF caseworker Elyse Nangle testified that Children have a bond with their current resource family, and call both foster mothers "Mom." *See* N.T., 12/22/23, at 68; *see also id.* (stating, "They're also very loving to each other."). Regarding Q.N.T., Ms. Nangle stated he has behavioral problems at school, including pulling a fire alarm and physical aggression, and

indicated these incidents often occur following his visits with Father. ***See id.*** at 70-71. Ms. Nangle also testified that Q.N.T. has exhibited some reluctance to participate in visits with Father. ***See id.*** at 71-72.

One of Children's foster mothers, C.D., testified Ja.T. and Jo.T. are doing well in their foster home. ***See id.*** at 133-35. Foster mothers have taken steps to schedule a speech therapy evaluation for Ja.T. ***Id.*** at 134. C.D. indicated that she and her partner had asked the Agency to remove Q.N.T. from their care, due to Q.N.T.'s recent behaviors of pulling the school's fire alarm and physically assaulting one of their children on the school bus. ***Id.*** at 135. However, C.D. agreed to continue caring for Q.N.T. for 30 days, until the Agency could find an appropriate placement setting. ***Id.***

We also observe the following statement by Children's GAL:

I know that [Father] loves his kids. I know [Children] love [Father]. They're extremely bonded. …

I concur with [counsel for CYF], we're not much further along than we were last time we were here. I think the road to reunification, if that even were to happen, is longer and further down the road now than we were in October because [Father's] married now[, and his wife has not been approved for visitation]. And we've been here for three years and we're pretty much in the same spot as far as my clients' right to permanency….

I think the [A]gency has met their burden across [subsection 2511(a)(1), (2), (5), and (8)], for the reasons that [counsel for CYF] discussed. …

I know [Father] is trying hard. I know he loves his kids. I know [Children] love [Father]. And I don't like it, but I think what's in the best interests of [Children] is to have permanency, stability, and I don't see it happening from … [Father] any time [] soon.

- 18 -

N.T., 12/22/23, at 188-89.

Our review reveals no error or abuse of discretion in the orphans' court's consideration of Children's needs and welfare. The record reflects that the orphans' court considered Children's bond with Father, while also balancing Children's emotional, developmental, and physical wellbeing. Consistent with the foregoing evidence and law, the orphans' court properly considered Children's needs and welfare pursuant to Section 2511(b). Accordingly, Father's first issue merits no relief.

In his second issue, Father challenges the juvenile court's orders changing Children's permanency goals from reunification to adoption. **See** Father's Brief at 34-37. As we have upheld the termination of Father's parental rights, this issue is moot. **See Interest of D.R.-W.**, 227 A.3d 905, 917 (Pa. Super. 2020) (father's challenge to child's goal change was moot after this Court affirmed the orphans' court's termination decrees).

Accordingly, we affirm the decrees terminating Father's parental rights to Children, and the orders changing Children's permanency goals to adoption.

Decrees and orders affirmed.

Judgment Entered.

![signature]

Benjamin D. Kohler, Esq.
Prothonotary


Date: 5/10/2024